**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF FLORIDA**
**PANAMA CITY DIVISION**

**KEITH BARNES,**
    **Plaintiff,**

**v.**                                    **Case No: 5:08cv298/RS/MD**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**
    **Defendant.**
_____

### REPORT AND RECOMMENDATION

This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Rules 72.1(A), 72.2(D) and 72.3 of the local rules of this court relating to review of administrative determinations under the Social Security Act and related statutes.  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Social Security Act for review of a final determination of the Commissioner of Social Security (Commissioner) denying claimant Barnes' application for disability insurance benefits and Supplemental Security Income benefits under Titles II and XVI of the Act.

Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

### PROCEDURAL HISTORY

Plaintiff Keith Barnes filed applications for benefits claiming an onset of disability, as amended,  of December 1, 2003.  The applications were denied initially

and on reconsideration, and plaintiff requested a hearing before an administrative law judge (ALJ). A hearing was held on February 10, 2005 at which plaintiff was represented by counsel and testified. A vocational expert also testified. The ALJ entered an unfavorable decision (tr. 16-26) and plaintiff requested review by the Appeals Council and submitted additional evidence. The Appeals Council considered the new evidence but declined review (tr. 7-9). The Commissioner has therefore made a final decision, and the matter is subject to review in this court. *Ingram v. Comm'r of Soc. Sec. Admin*, 496 F.3d 1253, 1262 (11th Cir. 2007); *Falge v. Apfel*, 150 F.3d 1320 (11th Cir. 1998). This timely appeal followed.[1]

## FINDINGS OF THE ALJ

Relative to the issues raised in this appeal, the ALJ found that plaintiff had severe impairments of affective mood disorder, post-traumatic stress disorder, alcohol and cocaine abuse by history, major depression and bipolar disorder by history, but that he did not have an impairment or combination of impairments that met or equaled one of the impairments listed in 20 C. F. R. Part 404, Subpart P; that he had the residual functional capacity to perform a narrow range of sedentary work; that he was a younger individual with a high school education with no transferable skills; that there were jobs in significant numbers in the national economy that he could perform; and that he was not under a disability as defined in the Act (tr. 24-25).

## STANDARD OF REVIEW

In Social Security appeals, this court must review de novo the legal principles upon which the Commissioner's decision is based. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005) (citing *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir.

---

[1]The filing would have been untimely but for the Appeals Council's late discovery of a timely request for extension, which the Appeals Council granted *nunc pro tunc* (tr. 6). Defendant does not contest timeliness.

1986)).  There is no presumption that the Commissioner followed the appropriate legal standards in deciding a claim for benefits, or that the legal conclusions reached were valid.  *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996); *Lewis v. Barnhart*, 285 F.3d 1329, 1330 (11th Cir. 2002).  Failure to either apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal.  *Ingram v. Comm'r of Soc. Sec.*, 496 F.3d 1253, 1260 (11th Cir. 2007).

The court must also determine whether the ALJ's decision is supported by substantial evidence.  *Moore*, 405 F.3d at 1211 (citing *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158-59 (11th Cir. 2004)).  Even if the proof preponderates against the Commissioner's decision, if supported by substantial evidence, it must be affirmed.  *Ingram*, 496 F.3d at 1260;  *Miles*, 84 F.3d at 1400.  Substantial evidence is more than a scintilla but less than a preponderance, and encompasses such relevant evidence as a reasonable person would accept as adequate to support a conclusion.  *Moore*, 405 F.3d at 1211 (citation omitted).  In determining whether substantial evidence exists, the court  must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Secretary's decision.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995). This limited review precludes deciding the facts anew, making credibility determinations, or re-weighing the evidence.  *Moore*, 405 F.3d at 1211 (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir.1983); *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996).  Findings of fact of the Commissioner that are supported by substantial evidence are conclusive. 42 U.S.C. § 405(g); *Ingram*, 496 F.3d at 1260.

A disability is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that

the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The social security regulations establish a five-step evaluation process to analyze claims for both SSI and disability insurance benefits. *See Moore,* 405 F.3d at 1211; 20 C.F.R. § 416.912 (2005) (five-step determination for SSI); 20 C.F.R. § 404.1520 (2005) (five-step determination for DIB). A finding of disability or no disability at any step renders further evaluation unnecessary. The steps are:

1. Is the individual currently engaged in substantial gainful activity?

2. Does the individual have any severe impairment?

3. Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4. Does the individual have any impairments which prevent past relevant work?

5. Do the individual's impairments prevent any other work?

These regulations place a very heavy burden on the claimant to demonstrate both a qualifying impairment or disability and an inability to perform past relevant work. *Moore*, 405 F.3d at 1211 (citing *Spencer v. Heckler*, 765 F.2d 1090, 1093 (11th Cir.1985)). If the claimant establishes such an impairment, the burden shifts to the Commissioner at step 5 to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001); *Allen v. Bowen,* 816 F.2d 600, 601 (11th Cir. 1987). If the Commissioner carries this burden, claimant must prove that he cannot perform the work suggested by the Commissioner. *Doughty,* 245 F.3d at 1278 n.2; *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987).

## PLAINTIFF'S MEDICAL HISTORY

The instant appeal relates almost completely to Mr. Barnes' mental condition. Accordingly, the following abstract of the medical record is limited to mental health issues unless otherwise relevant. The earliest recorded mental health treatment is dated May 17, 2001 when Mr. Barnes was seen by Patricia Adams, LCSW. He had recently been arrested for theft. He gave a history of marijuana and cocaine use, mental health treatment, drug treatment, and a prior diagnosis of bipolar disorder, and said that he was now referred to mental health counseling due to a history of violent outbursts and severe depression. He also related that he had attempted suicide at least three times and was taking Zoloft and Trazodone (tr. 248). Ms. Adams diagnosed Bipolar Disorder, Mixed, with a GAF of 60-55 (tr. 248). Shortly thereafter, on May 26, 2001, Mr. Barnes began seeing Linzey Faison, MSN, ARNP for psychiatric medication management at Ms. Adams' referral (tr. 317-64, 500-01, 506-07). Ms. Faison noted that Mr. Barnes was depressed and anxious, and had auditory and visual hallucinations with feelings of persecution (tr. 364). She diagnosed Major Depressive Disorder with Psychotic Features and noted a current GAF of 45 with a GAF of 45-60 during the past year (tr. 364). During the course of treatment, Ms. Faison prescribed varying and increasing doses of Neurontin, Klonopin, Seroquel, and Zoloft due to hallucinations, anxiety and depression (tr. 318, 328, 330, 340, 343, 345, 352, 354, 356, 364, 503, 511). Mr. Barnes' treatment was subsequently assumed by another nurse practitioner Judith Hussey, ARNP (tr. 499, 502-05, 510-11).

On June 7, 2001 Mr. Barnes returned to Ms. Adams, who noted a history of much anger and strong hallucinations. She felt that Mr. Barnes continued to need intensive outpatient therapy to prevent him from being hospitalized (tr. 243-44). On July 3, 2001, Ms. Adams submitted her impression of Mr. Barnes to the Division of Disability Determinations, and noted that due to his pain from an accident and his mood disorder that he had a poor memory and poor concentration (tr. 241). She also noted that Mr. Barnes limited his social interactions due to his mood disorder and

pain and that he had experienced difficulty dealing with rage.  He was learning anger management (tr. 241).  Ms. Adams opined that it would be very difficult for Mr. Barnes to find employment at that time due to his mood disorder and pain (tr. 241).  Ms. Adams continued to note hallucinations, anxiety, and inability to maintain concentration in 2001 (tr. 237-38).  On September 9, 2001, Mr. Barnes sought treatment at Life Management, and was diagnosed with Major Depressive Disorder, Recurrent, Severe, with psychotic features and a current GAF of 39.5

On October 8, 2001, Mr. Barnes was evaluated by psychologist Robin E. O'Hearn, Ph.D. at the request of the Commissioner (tr. 255).  Mr. Barnes reported that he held jobs for a few months and then got fired, and among the side effects from his medication were drowsiness and feeling constantly drained of energy (tr. 256).  Mr. Barnes claimed both perceptual and full-blown hallucinations and said that while his symptoms were fairly well controlled by his medication they remained present to some degree (tr. 257).  Dr. O'Hearn noted that Mr. Barnes was depressed and mildly anxious but also cooperative and polite (tr. 257).  Mr. Barnes had a slow pace and difficulty controlling his train of thought (tr. 258).  Dr. O'Hearn reported that Mr. Barnes appeared to have significant psychotic symptoms and mood disturbances.  She diagnosed Bipolar Disorder, Severe with Psychotic Features with a current GAF of 55 and highest GAF of 60 (tr. 258).  Dr. O'Hearn opined that with his significant psychotic symptoms and mood disturbances, Mr. Barnes' capability in performing tasks and dealing with social interactions at work were "fair to poor at this time." (Tr. 258).  If he were to be awarded benefits, Dr. O'Hearn noted Mr. Barnes could manage them with some assistance (tr. 258).

On October 9, 2001, Ms. Faison, filled out a mental health report at the Commissioner's request.  She noted that Mr. Barnes' mood and affect were flat, blunted and subdued, his thought process had some mild circumstantiality, his concentration was intact but limited and his speech was slow (tr. 260).  Mr. Barnes had no overt delusions or hallucinations, but showed some mild paranoid thinking,

the legitimacy of which was unclear (tr. 260-A). Ms. Faison diagnosed major depression with psychotic features, and a guarded prognosis with the chance for some improvement (tr. 260-A). Ms. Faison further opined that Mr. Barnes was too unstable to maintain an employment situation and that his ability to do so in the future was questionable (tr. 260-A). The Commissioner then requested that the form be co-signed by a licensed psychologist or psychiatrist (tr. 259). A psychiatrist co-signed Ms. Faison's statements and the form was resubmitted to the Commissioner (tr. 259-60A).

On October 3, 2002, Dr. O'Hearn examined Mr. Barnes a second time at the Commissioner's request; she did not note that she had previously examined him (tr. 369-72). Dr. O'Hearn noted that Mr. Barnes' grooming was poor and his hygiene was fair (tr. 369). Mr. Barnes reported being "impulsive and easy to anger" although the medication helped "keep [him] from doing anything stupid." (Tr. 370). He was taking Seroquel, Neurontin, Klonopin, Pamelor, Promethazine, Trazodone, and Zoloft, which caused drowsiness and lethargy (tr. 370). Mr. Barnes also reported "periods of decompensation during which he does not bathe, etc." and stated that he was generally unable to complete tasks such as making and keeping appointments, taking medications as prescribed, and doing routine chores in a timely and appropriate manner, and reported visual and auditory hallucinations (tr. 370-71). Dr. O'Hearn opined that Mr. Barnes exhibited mild paranoia, his mood was anxious and depressed, and his affect was fragile and restricted in range, although generally appropriate; that his ability to withstand workday stress and adapt to change was poor, that he was somewhat controlled on medication, but emotionally fragile and had poor self-control; and that "[h]is medication may impair concentration and alertness." (Tr. 371-72). Dr. O'Hearn again diagnosed Mr. Barnes with Bipolar Disorder, Severe with Psychotic Features but with a lower current GAF of 46 and highest GAF of 50 (tr. 372).

On May 23, 2003, Ms. Faison again completed a Mental Health Report for the Commissioner, stating that Mr. Barnes' mood was variable between depressed and anxious, he had significant problems with concentration and difficulty with task completion and his immediate and recent memory were impaired, but his fine motor coordination was slightly improved (tr. 404-05). He was not complaining of hallucinations, although he did have "unrealistic expectations" and his dress was "somewhat inappropriate." (Tr. 405). Ms. Faison opined that Mr. Barnes' memory and sustained concentration were "impaired" and his "social interaction and adaptation are minimally acceptable." (*Id.*). Ms. Faison stated that she had been seeing Mr. Barnes since May 2001 on a "regular 1-3 week basis, and working with him with psychotropic medication management psychotherapy from a cognitive/behavioral therapy approach." (*Id.*).

On November 4, 2004, Ms. Faison submitted a narrative opinion stating that Mr. Barnes had been diagnosed with Bipolar Disorder and had a "persistent mental illness which include[s] paranoia and pervasive loss of interest in most activities, sleep disturbance, psychomotor agitation, decreased energy, feelings of guilt and worthlessness, [and] difficulty concentrating and/or thinking." (Tr. 453). She noted that Mr. Barnes had expressed thought of hurting both himself and others, and had documented auditory hallucinations and paranoid thinking for which he was medicated. She further noted Mr. Barnes' "history of episodic periods manifested by the full symptomatic picture of both manic and depressive symptoms [and a] history of being unable to manage his finances without assistance from [a] parent or maintaining a job." (Tr. 453). Mr. Barnes was "currently characterized as depressed" with "marked restriction/difficulties in the following areas: activities of daily living, maintaining social functioning, maintaining concentration, persistence, or pace [with] repeated episodes of decompensation for extended periods of time." (*Id.*). His medical history "documents greater than 2 years' duration of chronic affective disorder, causing more than minimal limitation of ability to do basic work

activities, with signs and symptoms currently being addressed by medication or psychosocial support [and] more than two years' inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement."  (Tr. 453).

In a Questionnaire as to Mental Residual Functional Capacity, Ms. Faison and psychiatrist Edward Gibson, Jr., M.D. opined that Mr. Barnes had "marked" impairment in all areas of social interaction, which would not change even if he were in a situation with only minimal contact or interaction with others, "moderate" to "marked" impairment in all areas of sustained concentration or persistence, and "moderate" to "marked" impairment in almost all areas of adaptation, with an "extreme" impairment in the ability to maintain personal appearance.  It was noted that Mr. Barnes' impairments would be marked or extreme in all areas if he were placed under stress, and that the opinion was based on the attached report and Mr. Barnes' difficulty in relating to people both personally and socially (tr. 455-56).

On December 20, 2004, Dr. Gibson completed another Medical Verification Form indicating that Mr. Barnes was diagnosed with Bipolar Disorder, was permanently unable to work, was on medications that prevented work, and continued to require bi-weekly therapy (tr. 499).  The form was co-signed by Judy Hussey, ARNP (tr. 499).

Mr. Barnes sought a psychological evaluation at Life Management on March 9, 2005 (tr. 534-38).  He was taking Seroquel, Lexapro, Trazodone, and Klonopin, all prescribed by Ms. Faison (tr. 536).  The mental status evaluator noted that Mr. Barnes was unkempt and stood due to pain (tr. 534).  He was noted to have a history of marked or repeated auditory hallucinations, and occasional symptoms of anxiety, depression, impaired memory, obsessions, compulsions, delusions, suicidal ideation, and impaired ability to manage activities of daily living or make reasonable life decisions (tr. 534-35).  Mr. Barnes was diagnosed with Major Depressive Disorder, Recurrent, Severe, with psychotic features and a current GAF of 40 (tr.

538). In March and April 2005 Mr. Barnes attended stress and anger management sessions at Life Management (tr. 528-32).

On April 26, 2005, Ms. Hussey noted that Mr. Barnes' condition had not improved (tr. 585). He attended stress and anger management sessions at Life Management in April and May 2005 (tr. 598-600). He was diagnosed with History of Major Depression with Psychosis, in partial remission, Intermittent Explosive Disorder, rule out Schizoaffective Disorder, and Personality Disorder not otherwise specified and a GAF of 45 (tr. 604). He was instructed to taper and discontinue Klonopin, continue Lexapro for depression and anxiety, increase Trazodone for insomnia, depression, and anxiety, decrease Seroquel because his dosage of 1600 mg daily was twice the maximum dose, but continue at 800 mg for psychosis, start Haldol for psychosis, and start Depakote for mood lability, anger outbursts, and violent behavior (tr. 604).

Mary Tyll, Ph.D. performed a consultative evaluation for Mr. Barnes (tr. 548). She reviewed Ms. Faison's and Ms. Hussey's November 2004 statement, Ms. Faison's April 2003 report, and Dr. O'Hearn's October 2002 consultative examination report. Dr. Tyll noted that Mr. Barnes was "drowsy and lethargic, almost to the point of being in a stupor. He stated, 'It's the meds.'" (Tr. 550). Mr. Barnes was slumped sideways in his chair, and inappropriately pulled out his dentures and smoked the butt of a discarded cigarette he found in the ashtray. His psychomotor activity was decreased, and he was disheveled and unkempt with fair eye contact (tr. 550). He reported auditory and visual hallucinations, although he did not appear to be experiencing any, and reported thoughts of suicide and homicide without a plan (tr. 549-51).

Dr. Tyll opined that Mr. Barnes "voiced little insight into any of his problems and displayed poor judgment." (Tr. 551). She further opined that he "appears to have substantially deteriorated. He ambulated with a cane [] and displayed mild gait disturbance with unsteadiness noted while sitting, rising, and walking. He was

unkempt and disheveled… guarded and suspicious…. He appeared overly sedated." (Tr. 551). She found that he did not meet the full criteria for Bipolar Disorder, and that his reports of hallucinations "are somewhat suspect because he was vague about life experiences but "extremely clear regarding hallucinatory experiences." (Tr. 552). Nonetheless, Dr. Tyll opined that Mr. Barnes' "cognitive functioning revealed significant deficits in attention and concentration." (Tr. 552). Dr. Tyll diagnosed Posttraumatic Stress Disorder (provisional), Borderline Personality Disorder, and a GAF of 45 (tr. 552).

Dr. Tyll also completed a Medical Source Statement of Ability To Do Work-Related Activities (Mental) (tr. 554-56). She opined that Mr. Barnes had marked limitations in interacting appropriately with coworkers, responding appropriately to work pressures in a usual work setting, and responding appropriately to changes in a routine work setting. She further noted moderate limitation in ability to understand, remember, and carry out instructions, with moderate limitations in ability to interact appropriately with the public and supervisors. In support of her findings, Dr. Tyll noted that Mr. Barnes was prescribed a number of psychotropic medications "that dull his senses and suppress chronic homicidal ideations." (Tr. 555). Dr. Tyll estimated that Mr. Barnes could manage his own benefits, but also noted that he reported receiving significant care from family members (tr. 556).

On February 2, 2006, psychologist Lawrence V. Annis, Ph.D. evaluated Mr. Barnes at the ALJ's request and completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) (tr. 606-13). Dr. Annis reviewed Dr. Tyll's report (tr. 606). Upon examination there was an apparent gross muscle tremor with depression and anxiety (tr. 608). Mr. Barnes was unable to complete the MMPI-2 testing "because of his apparent inability to understand the test items sufficiently[.]" (Tr. 609). However, his memory testing was below average in all areas and deemed to be consistent with moderate diffuse organic cognitive involvement (tr. 609). Dr. Annis diagnosed substance-induced persisting amnestic disorder; borderline

personality disorder; major depressive disorder, recurrent (tr. 609). He felt that at least some degree of depression was likely to continue for the foreseeable future, and "[g]iven the apparent duration of the current memory difficulties revealed by interview and testing, full recovery of function is improbable." (Tr. 609). Dr. Annis opined that Mr. Barnes would have an extreme limitation in his ability to carry out detailed instructions, a marked limitation in his ability to understand and remember detailed instructions and interact appropriately with the public, and multiple moderate limitations (tr. 611-12).

## DISCUSSION

Mr. Barnes argues that the ALJ erred in failing to give appropriate weight to the opinions of the treating mental health professionals, in failing to give proper weight to Dr. Tyll's opinion, and in improperly determining Mr. Barnes' credibility. He contends that he was disabled from his onset date as a matter of law. The Commissioner argues that the ALJ's findings were supported by substantial evidence and must, therefore, be sustained. The issue thus presented is whether the ALJ's decision that the plaintiff was not disabled, in light of his mental condition, age, education, work experience, and residual functional capacity, is supported by substantial evidence in the record.

1.    <u>Treating mental health professionals.</u>

Mr. Barnes first argues that the ALJ erred in rejecting the detailed reports and opinions of Ms, Faison and Ms. Hussey. As discussed in the following section, and as this court is well aware, the opinion of a treating physician is entitled to great weight under most circumstances. However, the ALJ did not consider Ms. Faison and Ms. Hussey to be treating physicians, and accorded their opinions little weight. Mr. Barnes disagrees, reasoning that while the opinion of a person who is not an "acceptable medical source" (as an ARNP is not) cannot be used to establish a medically determinable impairment, the ALJ can still rely on those opinions to find

disability once a medically determined impairment is established. Since the ALJ found that Mr. Barnes suffered from affective mood disorder, post-traumatic stress disorder, major depression and bipolar disorder by history, the medically determinable impairments were established. It was therefore error, Mr. Barnes asserts, to give the opinions of the ARNPs little weight.

Mr. Barnes presents no authority for his position other then to note that while the regulations do not permit "other source" opinions to establish a medically determinable impairment, the regulations do <u>not</u> state that "other source" opinions can be given less weight once a medically determinable impairment has been established (doc. 25, p. 15-16). Case law in this circuit does not support Mr. Barnes' argument. In *Falge*, *supra*, the court held that the ALJ can give less weight to an "other source" professional (in that case, a chiropractor), even though the medically determinable impairment, neck and back injuries, were treated by a chiropractor. The same reasoning applies here. An ARNP is not considered an acceptable source, 20 C. F. R. 404.1513, and her opinion is not entitled to the weight afforded to a treating physician.[2] The ALJ did not err in giving little weight to the opinions of Ms. Faison and Ms. Hussey, and Mr. Barnes is not entitled to reversal on this ground.

2.   <u>Dr. Tyll.</u>

Mr. Barnes next contends that the ALJ erred in rejecting the opinion of Dr. Tyll concerning his residual functional capacity. Absent good cause, the opinion of a claimant's treating physician must be accorded considerable or substantial weight by the Commissioner. *Phillips v. Barnhart*, 357 F.3d 1232, 1240-1241 (11th Cir. 2004); *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *Broughton v. Heckler*, 776 F.2d 960, 960-961 (11th Cir. 1985); *Jones v. Bowen*, 810 F.2d 1001, 1005 (11th Cir. 1986). "Good cause" exists when: (1) the treating physician's opinion was not

---

[2]The court notes Dr. Gibson (and one other doctor) signed the reports by Ms. Faison and Ms. Hussey, but the record does not show that either of them ever saw Mr. Barnes, and the court is unwilling to assume on this record that they did. They therefore cannot be considered as treating physicians.

bolstered by the evidence; (2) the evidence supported a contrary finding; or (3) the treating physician's opinion was conclusory or inconsistent with the doctor's own medical records. *Phillips,* 357 F.3d at 1241; see also *Lewis*, 125 F.3d at 1440 (citing cases).

If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(d)(2). Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. See *Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also Schnor v. Bowen,* 816 F.2d 578, 582 (11th Cir. 1987). When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) medical evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the medical impairments at issue; and (6) other factors which tend to support or contradict the opinion. 20 C.F.R. 404.1527(d).

The opinion of a non-examining physician is entitled to little weight, and, if contrary to the opinion of a treating physician, is not good cause for disregarding the opinion of the treating physician, whose opinion generally carries greater weight. *See* 20 C. F. R. § 404.1527(d)(1); *Broughton v. Heckler*, 776 F.2d 960, 962 (11th Cir. 1985); *Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir. 1984); *Hurley v. Barnhart*, 385 F.Supp.2d 1245, 1255 (M.D.Fla. 2005). However, a brief and conclusory statement that is not supported by medical findings, even if made by a treating physician, is not persuasive evidence of disability. *Johns v. Bowen*, 821 F.2d 551, 555 (11th Cir. 1987); *Warncke v. Harris*, 619 F.2d 412, 417 (5th Cir. 1980).

"When electing to disregard the opinion of a treating physician, the ALJ must clearly articulate its reasons." *Phillips*, 352 F.3d at 1241. Failure to do so is reversible error. *Lewis*, 125 F.3d at 1440 (citing *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986));[3] *see also Nyberg v. Commissioner of Social Security*, 179 Fed.Appx. 589, 591 (11th Cir. 2006) (Table, text in WESTLAW)(also citing *MacGregor*).

The ALJ gave little weight to Dr. Tyll's opinion because during her examination, she noted that Mr. Barnes appeared overly sedated and was in a drug-induced stupor (tr. 21). The ALJ noted that Dr. Tyll had opined that Mr. Barnes had deteriorated since she had seen him a year earlier, but that she also pointed out the lack of corroborating records and Ms. Faison's inconsistencies (*id.*). Indeed, Dr. Tyll stated that Mr. Barnes was "drowsy and lethargic, almost to the point of being in a stupor[,]" which Mr. Barnes blamed on his medications, but that he "appeared <u>overly</u> sedated." (Tr. 551) (emphasis added). Being overly sedated does not support Mr. Barnes' implied claim that he was taking only his prescribed medications (doc. 25, p. 18). And, as the ALJ noted, Dr. Tyll pointed out that Mr. Barnes' claims of hallucinations were suspect, because he had difficulty reporting his normal life events but "was extremely clear regarding hallucinatory experiences." (Tr. 552). The ALJ did not err in rejecting Dr. Tyll's opinion, and Mr. Barnes is not entitled to reversal on this ground.

### 3. Mr. Barnes' credibility.

Finally, Mr. Barnes contends that the ALJ erred in finding him less than credible. As this court is well aware, pain and other subjective complaints are treated by the Regulations as symptoms of disability. Title 20 C.F.R. § 404.1529 provides in part that the Commissioner will not find disability based on symptoms, including pain alone, ". . . unless medical signs or findings show that there is a medical condition that could be reasonably expected to produce these symptoms."

---

[3]*MacGregor* further held that "Where the [Commissioner] has ignored or failed properly to refute a treating physician's testimony, we hold as a matter of law that he has accepted it as true." 786 F.2d at 1053.

*Accord* 20 C.F.R. § 416.929. The Eleventh Circuit has articulated the three-part pain standard, sometimes referred to as the *Hand*[4] test, as follows:

> In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.

*Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (citing *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991); *Ogranaja v. Commissioner of Social Security*, 186 Fed.Appx. 848, 2006 WL 1526062, *3+ (11th Cir. 2006) (quoting *Wilson*) (Table, text in WESTLAW); *Elam v. Railroad Retirement Bd.*, 921 F.2d 1210, 1216 (11th Cir. 1991).

Underlying the *Hand* standard is the need for a credibility determination concerning a plaintiff's complaints. Those complaints are, after all, subjective. "[T]he ascertainment of the existence of an actual disability depend[s] on determining the truth and reliability of [a claimant's] complaints of subjective pain [or other symptom]." *Scharlow v. Schweiker*, 655 F.2d 645, 649 (5th Cir. 1981) (holding that the ALJ must resolve "the crucial subsidiary fact of the truthfulness of subjective symptoms and complaints").[5] People with objectively identical conditions can experience significantly different levels of pain, and pain is more readily treated in some than in others. "Reasonable minds may differ as to whether objective medical impairments could reasonably be expected to produce [the claimed symptom]. This determination is a question of fact which, like all factual findings by the [Commissioner], is subject only to limited review in the courts . . . ." *Hand, supra,* at 1548-49. It is within the ALJ's "realm of judging" to determine whether "the

---

[4] *Hand v. Bowen*, 793 F.2d 275, 276 (11th Cir.1986) (the case originally adopting the three-part pain standard).

[5] Decisions of the United States Court of Appeals for the Fifth Circuit decided prior to September 30, 1981 are binding precedent in the Eleventh Circuit. *Bonner v. Pritchard*, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).

quantum of [symptoms a claimant] allege[s] [is] credible when considered in the light of other evidence." *Arnold v. Heckler*, 732 F.2d 881, 884 (11th Cir. 1984). The evidence as a whole, including the existence of corroborating objective proof or the lack thereof, and not just a physician's belief or the plaintiff's claims, is the basis for the ALJ's credibility determination.

In this case, the ALJ specifically noted that in assessing plaintiff's credibility he also considered plaintiff's daily activities; the location, duration frequency of pain or other symptoms; factors that precipitate or aggravate the symptoms; the type, dosage, effectiveness of plaintiff's medications, and treatments he received other than medication (tr. 22-23). The ALJ found that Mr. Barnes' condition had not changed, according to Ms. Faison, from the time she first saw him in May, 2001, until the hearing, yet he worked during all of 2001 and 2002 and most of 2003, at least part time. According to his work records, Mr. Barnes earned $10,507 in 2001, $6,188 in 2002 and $6,616 in 2003 (tr. 148). He argues that these amounts (other then 2001) are insufficient to support a finding of substantial gainful activity which is true, but the ALJ did not find that Mr. Barnes could go back to his prior relevant work spray painting, which involved working with the public and co-workers. Rather, he found that Mr. Barnes could do only "unskilled, entry level, simple, rote, repetitive work with only occasional contact with the public, co-workers and supervisors due to severe mental impairments." (Tr. 19). Based on input from a vocational expert at the hearing, the ALJ found that Mr. Barnes could work as an escort vehicle driver, surveillance system operator or bench assembler, all jobs that existed in substantial numbers in the economy (tr. 24). Therefore, the fact that Mr. Barnes' work during 2001, 2002 and most of 2003 was only part time does not support a finding that he could not work full time in some other field. It does, however, undermine his credibility when he was working for a significant period of time during which his mental condition remained essentially unchanged.

The ALJ's determination that Mr. Barnes' testimony and claims of disability were less than fully credible was supported by substantial record evidence, and Mr. Barnes is not entitled to reversal on this ground.

Accordingly, it is respectfully RECOMMENDED that the Commissioner's decision be AFFIRMED, that judgment be entered in favor of the defendant, and that the clerk be directed to close the file.

At Pensacola, Florida this 31st day of August, 2009.


/s/ *Miles Davis*
**MILES DAVIS**
**UNITED STATES MAGISTRATE JUDGE**




## NOTICE TO PARTIES

Any objections to these proposed findings and recommendations must be filed within ten days after being served a copy hereof. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u> A copy of any objections shall be served upon any other parties. Failure to object may limit the scope of appellate review of factual findings. See 28 U.S.C. § 636; *United States v. Roberts*, 858 F.2d 698, 701 (11th Cir. 1988).